Romano PAGNAN & F.LLI,
Plaintiff-Appellant,

v.

MISSISSIPPI RIVER GRAIN ELEVATOR, INC., Defendant-Appellee.

No. 82–3145.

United States Court of Appeals,
Fifth Circuit.

Jan. 31, 1983.

Heisler & Wysocki, James A. Wysocki, New Orleans, La., for plaintiff-appellant.

William W. Miles, Metairie, La., for Mississippi River Grain Elevator, Inc.

Before WISDOM, REAVLEY and TATE, Circuit Judges.

TATE, Circuit Judge:

In this suit, the plaintiff ("Pagnan") sought damages from the defendant ("Grain Elevator") for breach of a contract between the parties. Pagnan, a grain dealer of Italy, claims damages for Grain Elevator's delay in loading corn onto its time-chartered vessel the BRUSSEL. On a jury trial of liability alone, the jury found (a) that Grain Elevator had breached its contract to load vessels on a first-come, first-served basis, and (b) that Grain Elevator had thereby committed a *"willful act* or a *gross[ly] negligent act"* in calling another vessel of lower priority, the NOPAL JAPANA, to berth ahead of the BRUSSEL. However, the district court granted Grain Elevator's motion for judgment notwithstanding the verdict, Fed.R.Civ.P. 50(b), finding no substantial evidence that the bypassing was other than a valid business judgment and thus could be neither a breach of the contract nor a "willful" nor a "grossly negligent" act. We reverse, finding that substantial evidence before the jury permitted it to find the breach of the contract and that such breach was willful or grossly negligent.

(1)

The following is the undisputed factual context out of which this litigation arises:

Grain Elevator was notified on July 11, 1975, by Mitsui, the owner and prospective shipper, that it had purchased some one million bushels of "No. 3" yellow corn that would be shipped for loading from the elevator at some time between August 5 and August 25 onto the BRUSSEL, and that vessel would arrive in the area about July 20. The BRUSSEL arrived at Grain Elevator's facility on July 21 and filed for and was accepted for berth to load on that same day. According to Grain Elevator's tariff (see below), it was thereby entitled to be assigned a berth ahead of vessels that arrived subsequently. However, no loading could commence until Mitsui shipped the corn (in barges) to Grain Elevator's facility, which order is shown (*see* note 8 *infra*) to have occurred by August 5. There was no obligation of Grain Elevator to berth the loading vessel until the shipper Mitsui had confirmed by written telex its order that the elevator deliver the corn in question to the BRUSSEL—and this confirmation order was not received by Grain Elevator until 10:20 a.m. on August 6.

Over the protests of its agent, the BRUSSEL was first bypassed by a later-arriving vessel (the MEXICAN GULF), which was called to berth and started loading on August 6, 1975 at 6:00 p.m.—the jury, however, found this bypassing not to have been a breach of the contract, apparently because of the belated confirmation order. The BRUSSEL was not called to berth by Grain Elevator to begin loading until 6:54 p.m., August 11. The BRUSSEL had again been bypassed at 6:00 p.m. on August 8, 1975, by the NOPAL JAPANA, which had not filed for berth until August 4 (about two weeks after the BRUSSEL). The trial jury found that this second bypassing was a willful and grossly negligent violation of the contract that caused delay damages (of three days and fifty-four minutes) to the BRUSSEL.

(2)

Both parties agree that the law between the parties is established by a contract resulting from Pagnan's acceptance of the conditions of Grain Elevator's tariff per-

taining to grain shipments. Pagnan relies upon a provision of the tariff that "vessels shall be assigned berth in [the] chronological order in which they file for berth." [1] In claiming a nonbreach of the contract despite its bypassing of the BRUSSEL, Grain Elevator relies upon a provision of the contract allowing it discretion to alter the turn of the vessel under certain conditions, pertinently whether "in its judgment" the bypass was "in the best interest of the elevator operations" and also when there was a "nonavailability in the elevator" of grain of adequate grade or quantity.[2] The defendant Grain Elevator also relies upon a provision of the contract that, even though there was a breach, it could not be liable for delay damages unless its breach was a "willful" or a "gross[ly] negligent" act.[3]

We should note: In terms, the deviation clause permits Grain Elevator "in its sole discretion" to determine the "best interest of the elevator operations." See full deviation clause quoted in note 2, supra. How-ever, the evidence suggests that in the custom of the trade the discretion so exercised must be in the course of "sound business management," (cf., Tr. 101, 107.) In determining whether the discretion was properly exercised, the district court's test was whether the deviation decision was a "valid business judgment", Tr. 154–165. No serious contention seems to be advanced to contradict that this was the nature of the discretion intended by the meaning of the terms under the custom of the trade.[4]

(3)

The issues posed to the jury were: (a) whether Grain Elevator's bypassing of the BRUSSEL in favor of the subsequently arriving NOPAL JAPANA was a breach of the contract—i.e., whether it exercised its discretion to do so on the basis of a valid business judgment, rather than simply because its manager may have preferred to do so; and (b) whether, if so, this breach was the result of a "willful act" or a "grossly negligent act" [5]—in the absence of which,

1. The full provision is as follows:
   Except as otherwise stipulated between the elevator and the vessel, her owner or agents, vessels shall be assigned berth in chronological order in which they file for berth with the elevator office.

2. The full provision states:
   The elevator management, in its sole discretion, may alter the turn of vessels to be loaded [a] when, in its judgment, it is in the best interest of the elevator operations; [b] when there is urgent need to receive or load to a ship a particular grade and kind of grain; [c] to facilitate the berth conditions; or [d] whenever the elevator decides that there is nonavailability in the elevator of adequate grade, quantity, or quality of grain to be shipped or loaded on the vessel without delaying the vessel itself, or delay, prevent, or obstruct the normal elevator activity.

3. The provision states:
   The elevator shall not be liable for demurrage, damages for delay or loss of dispatch time incurred by any vessel or charterer for any cause other than willful or gross negligent acts of the elevator management.

4. Indeed, a construction of the provision that Grain Elevator was given exclusive unreviewable and unfettered discretion to alter the first-come, first-serve rule, would make meaningless that clause, which provides for the chronological-order rule "[e]xcept as otherwise stipulated

between elevator and the vessel." See note 1, supra, for clause in full. Reading the contract as a whole and affording meaning to each of its provisions, the district court's construction of the contract appears to be appropriate.

5. In its instructions to the jury, the district court defined these terms as follows:
   An act is "willful" if it is intentional, deliberate or voluntary as distinguished from accidental. Thus, if you find that the defendant's actions in bypassing the BRUSSEL was not permitted under the contract, then you should consider whether the defendant intentionally, deliberately or voluntarily desired to bypass the BRUSSEL in disregard of its duty to berth the BRUSSEL to load grain before berthing the MEXICAN GULF or the NOPAL JAPANA.
   Gross negligence is the entire absence of care or very great negligence. It consists of an utter disregard of the dictates of prudence and amounts to the complete neglect or disregard of the rights of others. Thus, if you find that the defendant's action in berthing the MEXICAN GULF and the NOPAL JAPANA before the BRUSSEL was not justified under the contract, then you should consider whether defendant's actions were taken in reckless disregard of plaintiff's rights under the contract to have the BRUSSEL berthed and loaded before either the MEXICAN GULF or the NOPAL JAPANA.

under the contract Grain Elevator would not be liable for the delay damages sought. Answering interrogatories submitted to it, the trial jury found that the bypass was a breach of the contract and also that it was "a willful act or a grossly negligent act".

To anticipate the subsequent discussion, the apparent basis on the record for the jury's determinations is evidence from which the jury could reasonably have found: The barges containing the Mitsui corn had arrived at Grain Elevator's facilities by August 5 (see note 8 infra). Although Grain Elevator had no obligation to commence unloading grain into the elevator until receiving Mitsui's confirmation order at 10:20 a.m. on August 6, under the custom of the trade—knowing that the BRUSSEL was next in line for berthing and loading—the elevator's failure to commence unloading the Mitsui-corn barges soon after the confirmation order in preparation to load them onto the BRUSSEL, next at berth, see note 8 infra, was grossly negligent or a deliberate disregard of the BRUSSEL's first-come, first-served rights, since instead Grain Elevator unloaded three or four barges (containing about 50,000 bushels each) into the elevator to complete the NOPAL JAPANA's loading cargo after the elevator had taken the vessel into berth out of turn at 6:00 p.m. on August 8. (The defendant had previously already bypassed the BRUSSEL in favor of the later-arriving MEXICAN GULF at 6:00 p.m. on August 6.) Further, there was already in the elevator storage some 350,000 bushels of corn of the right grade that were available for loading onto the BRUSSEL on August 6,[6] and sound business practice that recognized

the BRUSSEL's priority berthing rights would have permitted Grain Elevator to commence loading the BRUSSEL with this grain, while at the same time unloading Mitsui's grain from the barges into the elevator (and inspecting it and testing it for weevils) to continue and complete the loading of BRUSSEL if it was then at berth in its proper turn.

We should here note that all 1,020,000 bushels of Mitsui's grain were unloaded from the barges at some time between 7:00 a.m. Friday, August 8, and 7:00 a.m. Monday, August 11 (the day on which, at 6:54 p.m., the BRUSSEL was finally called to berth). The elevator had an unused storage capacity of about three million bushels at the time. If the unloading of Mitsui's grain from the barges (within the sole control of Grain Elevator) had commenced soon after Grain Elevator received Mitsui's confirmation order at 10:20 a.m. August 6, the jury may well have inferred that Mitsui's grain would have been fully unloaded (or nearly so) into the elevator at the time the loading berth fell vacant at 6:00 p.m. on August 8, Friday—and when, instead of the BRUSSEL, the recently-arrived NOPAL JAPANA was called by Grain Elevator to berth. The jury may reasonably have found from this evidence that the failure to unload the Mitsui grain earlier was a purposeful and deliberate violation, or at least a grossly negligent one, of Grain Elevator's contractual right to be next at berth, being deliberately intended to prefer the NOPAL JAPANA, that had just arrived four days earlier, some two weeks after the BRUSSEL was accepted for berth.[7]

Neither party objected to these instructions.

**6.** The evidence shows that, except where restricted by warehouse receipt or "identity-preserved" encumbrance, the elevator was free to use earlier-received grain of equivalent quality to commence or complete loading operations, without regard to its initial ownership, merely replacing it by equivalent grain from the shipper. Unlike some 800,000 bushels under warehouse receipt to the NOPAL JAPANA's shipper (and thus available for loading only onto the NOPAL JAPANA) in the elevator on August 6, the other 350,000 bushels of corn of the right grade in the warehouse were thus available for

loading on a first-in, first-out basis, to be replaced by equivalent grain from Mitsui, likewise to unloaded into the elevator on a non-"identity-preserved" basis.

**7.** When asked why he had not commenced loading the Mitsui grain on August 6, Grain Elevator's manager advanced several hypotheses ("chances are", "it could be", Tr. 211–12), but never testified as to a particular concrete reason. The jury may have found his explanation unconvincing.

The evidence further indicates that up to 14 barges (700,000 bushels of corn) could be load-

**(4)**

In granting Grain Elevator judgment notwithstanding the verdict in this admittedly close case, our able trial brother concluded that no substantial evidence supported the jury's determination that Grain Elevator's decision to bypass the BRUSSEL in favor of the NOPAL JAPANA was a breach of the contract. Citing the plaintiff's chief witness, the trier concluded that the evidence without dispute showed Grain Elevator's decision to have been a valid business judgment.

However, the testimony under cross-examination of this witness to this effect, Tr. 90, Tr. 101, was expressly on the assumption that the priority ship's grain was not in the elevator and available for loading. Under re-direct examination, the witness qualified this view by noting that under trade practice it was the responsibility of the elevator to position grain timely furnished by the shipper (in barges) in the elevator for loading to meet the loading requirements of vessels with priority berthing rights. Tr. 110–11. In our view, the jury could properly conclude from this testimony that the elevator was not free to delay unloading timely-received grain in order, at its own whim, to alter or delay the priority berthing rights to which under the contract the vessel was entitled for which the unloaded grain was intended.

Grain Elevator's manager enunciated various business reasons why he had preferred the NOPAL JAPANA over the BRUSSEL, despite the latter's priority right in berthing. However, on receiving the BRUSSEL's protests on August 6 and August 8 when each bypassing occurred, *at the time* he had replied by telex on each

occasion that, under the tariff, "we have the right to alter the turn of vessels filed at our discretion for the convenience of the elevator." Tr. 192. The jury may well have believed the manager's explanations, at the trial five years later, of why the bypass was in Grain Elevator's best business interest, were in the nature of afterthoughts—that his real reason for taking the NOPAL JAPANA out of turn ahead of the BRUSSEL was simply that it was more convenient to him to load the NOPAL JAPANA first, and that his deliberate violation of the BRUSSEL's contractual rights was due to his mistaken construction of the contract (see text at note 4 *supra* & note 4) as giving him the complete discretion—instead of one conditioned upon the exercise of a valid business judgment—to ignore BRUSSEL's priority berthing rights.

Judgment notwithstanding a jury verdict should be granted only if, after considering all the evidence with all reasonable inferences and credibility evaluations most favorable to the party opposed to the motion, "the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict." *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc). On the other hand, judgment notwithstanding the verdict cannot be granted, where there is "substantial evidence" upon which the jury verdict could be based—*i.e.,* "evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions." *Id.*

While recognizing that the issue is close, for the reasons above-indicated,[8] in our

---

ed in a day, although usually only 5 to 6 barges (250,000–300,000 bushels) were. There were about 20 barges of Mitsui corn on barges at the elevator waiting to be unloaded, or so the jury may reasonably have found. *See* note 8, *infra.*

**8.** We summarize here record references to what we regard as perhaps the dispositive legal and factual issues of the trial: ·(a) whether the shipper, Mitsui, had timely sent the grain by barges to Grain Elevator; and (b) if so, whether the elevator was under any obligation under the facts to have unloaded the grain from the

barges into the elevator (for grade and weevil inspection purposes, including weevil fumigation, if necessary), so that it could begin and complete the loading of the BRUSSEL, when its contemplated turn at berth was to come (as the plaintiff contends) at 6:00 p.m. on August 8.

As to (a): The uncontradicted evidence shows that it was the obligation of the shipper (Mitsui) to get the grain to the elevator in time for its loading. Tr. 90. Grain Elevator's manager testified that the reason that Mitsui's grain was still out in the barges on August 8 was

view there is substantial evidence from which the jury could properly find that the defendant Grain Elevator breached its contract and that its bypassing the BRUSSEL in favor of the NOPAL JAPANA was either a willful or a grossly negligent act.

*Conclusion*

We therefore REVERSE the judgment of the district court that granted the judgment notwithstanding the verdict and dismissed the suit, and we REMAND for further proceedings consistent with this opinion. Insofar as the plaintiff complains that the district court erred in relieving the defendant of a pretrial stipulation as to damages, the plaintiff agreed to that action before the trial commenced, Tr. 9; having consented to the action without trial objection, he cannot now complain of the alleged error on appeal.

REVERSED AND REMANDED.

because Mitsui had not yet sent it. Tr. 216. However, evidence before the jury permitted to find that the manager's recollection was incorrect:

When the manager had informed the BRUSSEL's agent that the barges had not arrived, in connection with the first earlier bypassing of August 6, the agent called up Mitsui's representative and was informed that the cargo was at the elevator, Tr. 84, see also Tr. 106. The records of the elevator show that, as of August 6, there were twenty barges of corn waiting to be unloaded, totaling 1,034,981 bushels, Tr. 41; and, in fact, at sometime between August 8 (a Friday) and 7:00 a.m. on Monday, August 11, the one million tons of Mitsui's corn were in fact unloaded into the warehouse, Tr. 145–46. Under the evidence, the jury was free to find that Mitsui's corn had been shipped and was on barges at least by August 5 and—no nonspeculative reason is suggested as to why it was not unloaded into the elevator, in time to permit its loading onto the BRUSSEL when the BRUSSEL's proper time for berth arrived at 6:00 p.m. on August 8, 1975.

As to (b): The BRUSSEL's agent testified that a reasonably prudent elevator operator, with knowledge that a vessel is coming to berth and will need so many tons of a certain grade of corn, would make arrangements to have that grain available in the elevator for loading before the ship came to berth. Tr. 110–11. Under the evidence, the jury could properly find that, where grain of the specified grade had been delivered by the shipper in barges to the elevator—with exclusive control of when to commence unloading same into the elevator, for subsequent reloading onto the vessel—violated its contractual duty if it deliberately left the grain out in the barges, as a result being unable to load the priority vessel; and instead unloaded grain from other barges for another vessel of lower berthing priority, in order to load it ahead of the priority vessel.